IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

GUSTAVUS A. AULL, III,

                           Plaintiff,        Civil Action No.
v.                                    5:05-CV-1196 (LEK/DEP)

MICHAEL J. ASTRUE,[1]
Commissioner of Social Security,

                           Defendant.

_____

APPEARANCES:              OF COUNSEL:

FOR PLAINTIFF:

OLINSKY & SHURTLIFF, LLP      HOWARD D. OLINSKY, ESQ.
300 South State Street           JAYA A. SHURTLIFF, ESQ.
Syracuse, New York 13202

FOR DEFENDANT:

HON. GLENN T. SUDDABY       WILLIAM H. PEASE, ESQ.
P.O. Box 7198                  Special Assistant U.S. Attorney
100 South Clinton Street
Syracuse, New York 13261-7198

_____

     [1]     Plaintiff's complaint, which was filed on September 21, 2005, named Jo
Anne B. Barnhart, the former Commissioner of Social Security, as the defendant.  Dkt. No.
1.  On February 12, 2007, Michael J. Astrue took office as Social Security Commissioner.
He has therefore been substituted as the named defendant in this matter pursuant to Rule
25(d)(1) of the Federal Rules of Civil Procedure, and no further action is required in order
to effectuate this change.  *See* 42 U.S.C. § 405(g).

OFFICE OF GENERAL COUNSEL          BARBARA L. SPIVAK, ESQ.
Social Security Administration          Chief Counsel, Region II
26 Federal Plaza
New York, New York 10278          KAREN M. ORTIZ, ESQ.
                                 Assistant Regional Counsel
DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Plaintiff Gustavus A. Aull, III has commenced this proceeding seeking

judicial review of the denial of his application for disability insurance benefits

("DIB") and supplemental security income ("SSI") payments under the Social

Security Act, based upon an agency finding that at the relevant times

 he was not disabled, within the meaning of the Act.  In support of his

challenge, plaintiff maintains that the administrative law judge ("ALJ") who

heard the matter at the agency level and made that determination erred in a

number of respects, failing to satisfy his duty to develop the record regarding

plaintiff's reported depression, determining plaintiff's residual functional

capacity ("RFC") without elaboration, including by performing the required

function-by-function analysis, and through the elicitation of testimony from a

vocational expert who is neither properly qualified nor was provided with a

hypothetical closely approximating plaintiff's circumstances.  Plaintiff

therefore asserts that the determination of no disability lacks the support of

substantial evidence.

Having carefully reviewed the record now before the court, in light of plaintiff's arguments, I agree that the ALJ both failed to apply proper legal principles, and arrived at a determination which is not supported by substantial evidence in the record. Accordingly, I recommend that the Commissioner's determination be vacated and the matter remanded to the agency for further consideration.

I.     BACKGROUND

A.     General Background

Plaintiff was born in 1961, and was 43 years old at the time of the ALJ's decision. Administrative Transcript at 16, 97.[2]  Plaintiff is a high school graduate, and in the past has worked as a carpenter, tile layer, laborer, assistant project superintendent and safety coordinator. AT 116. Plaintiff has not worked since February 15, 1996, as a result of a neck injury experienced at work while laying tile. *Id.*; *see also* AT 97. Plaintiff attributes his inability to work due to persistent neck and cervical spine pain, degenerative disc disease, and depression. AT 183, 200; *see also* AT 115-

---

[2]     Portions of the administrative transcript, Dkt. No. 4, which was filed by the Commissioner and is comprised of evidence and proceedings before the agency, will be cited herein as "AT ___."

16.  Plaintiff has sought treatment for his persistent pain through a variety of sources, and has been treated at different junctures using various regimens, including two surgeries.

### B.   Treating Sources

Following the onset of his condition, plaintiff initially treated with Dr. Jalal Sadrieh, an orthopedist, complaining of pain and dizziness.  AT 304. Dr. Sadrieh found tenderness in plaintiff's cervical spine and paravertebral muscles, with little radiation down the arm, and prescribed Ibuprofen for pain. *Id.*  On March 5, 1996, Dr. Sadrieh noted that plaintiff was doing somewhat better, but was still experiencing neck pain and tightness in the trapezius area.  AT 302.

On March 11, 1996 plaintiff consulted with Dr. Joseph T. Barry, of Preventative Medicine Associates.  AT 326.  Noting that plaintiff had been undergoing "intensive and aggressive therapy" since September of 1995, Dr. Barry diagnosed Aull as suffering from cervical strain, adding that in his opinion plaintiff's "[c]ervical spasm is clear cut, but not horrendous."  *Id.* Based upon his examination Dr. Barry advised the plaintiff to remain out of work for two weeks.  *Id.*

Plaintiff followed up with Dr. Sadrieh on April 2, 1996, continuing to

-4-

complain of neck pain and tenderness in the cervical spine.  AT 300.  Dr.

Sadrieh advised the plaintiff to remain out of work and to continue therapy.

*Id.*  Plaintiff was again see by Dr. Sadrieh on April 23, 1996, at which time the

physician noted that plaintiff was doing much better, and that his neck pain

had improved.  AT 298.  On June 3, 1996, Dr. Sadrieh saw the plaintiff again,

and noted that the neck pain had been exacerbated by Aull's attempt to drive

a riding lawn mower.  AT 296.  Following that visit, Dr. Sadrieh requested

authorization for magnetic resonance imaging ("MRI") testing from the

worker's compensation carrier.  *Id.*

In notes of a visit on July 10, 1996, Dr. Sadrieh reported that plaintiff

complained of pain in the neck without major change, as well as tenderness

in the cervical spine region.  AT 294.  Dr. Sadrieh also observed that a June

25, 1996 MRI had revealed degenerative disc disease at the C4-C5 level,

with a bulging disc at that level, and a Chiari I malformation in the foramen

magnum region.  *Id.*  Based upon his examination and those findings, Dr.

Sadrieh recommended that the MRI be neurologically evaluated.  *Id.*

On August 13, 1996 plaintiff consulted with Dr. Ronald Naumann, a

neurosurgeon.  AT 312.  Dr. Naumann interpreted the MRI testing report as

showing degenerative disc disease and spondylosis at C4-5, but as being

otherwise unremarkable.  *Id.*  During his examination, Dr. Naumann noted

that plaintiff demonstrated cervical muscle spasm and tenderness to

palpation of the cervical spine.  *Id.*  Dr. Naumann prescribed the use of home

traction equipment, anti-inflammatories, and exercises, and opined that

plaintiff could perform "light work."  *Id.*  On subsequent visits to Dr. Naumann,

on September 19, 1996 and again on October 21, 1996, plaintiff stated that

he had pain in his neck and numbness in his hands.  AT 311.  On November

21, 1996, plaintiff reported that traction was proving helpful.  *Id.*  Plaintiff

reported some improvement to Dr. Naumann on January 15, 1997, but

indicated that he experienced discomfort with any kind of physical activity,

particularly involving his neck and shoulders.  *Id.*

Plaintiff saw Dr. Naumann again on March 17, 1997, complaining of

shoulder pain and hand numbness. AT 308.  On that occasion Dr. Naumann

suggested another anti-inflammatory, and opined that plaintiff may be

suffering from an element of thoracic outlet syndrome, but that he was

neurologically "quite intact."  *Id.*

The plaintiff consulted with Dr. David Eng, a neurologist, beginning on

June 23, 1997.  AT 208-09.  Dr. Eng interpreted the June 25, 1996 MRI test

results as showing a Chiari I malformation and some neuroforaminal

narrowing, right greater than left, at C4-C5.  AT 209.  In order to explore the matter further, Dr. Eng ordered nerve conduction studies, which when performed did not reveal any evidence of cervical radiculopathy.  AT 206, 209.  Dr. Eng accordingly recommended conservative treatment, and referred plaintiff for pain management.  AT 206.

An anesthesiology pain evaluation was subsequently performed by Dr. Allan Goldstein, of the Office of Pain Management, on December 29, 1997. AT 314-15.  Based upon that testing Dr. Goldstein found that upon physical examination, plaintiff's cervical spine showed a slight decrease in range of motion ("ROM") in all directions, and that there was mild midline tenderness of the cervical spine and tenderness to deep palpation of the shoulder muscles and suprascapular portions of the trapezius bilaterally.  AT 314.  It was also determined that plaintiff had no sensory deficits in the upper extremities, motor power was 5/5, and ROM of the shoulder joints was full. AT 314-15.  The resulting impression was recorded as probable chronic cervical strain with possible myofascial component.  AT 315.

Plaintiff followed up at the Office of Pain Management on May 26, 1998.  AT 194.  On that occasion he reported experiencing continued neck pain, trapezius pain, numbness and tingling radiating to the third, fourth, and

fifth fingers of both hands, and was prescribed Daypro and Amitriptyline for the pain.  *Id.*

Plaintiff saw Dr. Eng on June 11, 1998, reporting having experienced significant relief of neck pain following an initial epidural injection at the Office of Pain Management.  AT 205.  Plaintiff returned to Dr. Eng on June 30, 1998, following three epidural injections.  AT 204.  During that visit Aull reported some recurrence of symptoms with tingling and numbness in both sides of his hands and some return of neck pain.  *Id.*  Upon physical examination, plaintiff showed decreased pinprick sensation on the right in the C6-C7 area, and ordered further MRI testing.  *Id.*

Dr. Joseph Agnello, of the Office of Pain Management, noted on August 3, 1998 that plaintiff had undergone epidural steroid blocks, with some improvement in pain and diminished headaches.  AT 192.  Dr. Agnello also noted marginal improvement in plaintiff's sleep patterns, and stated that plaintiff's pain continued across the upper back region and into both arms, reporting that plaintiff continued to use home traction and a TENS unit.  *Id.*

On October 16, 1998, plaintiff was examined at the Office of Pain Management by Dr. Robert Tiso.  AT 190-91.  A physical examination conducted on that date revealed full cervical range of motion, with increased

pain on rotation to the right and with extension, and tenderness to palpation of the posterior neck and trapezius.  AT 191.  Sensory examination revealed increased numbness of the right second, third, and fourth fingers on the ulnar side, increased numbness on the right along the C7 and C8 dermatome and on the left upper arm at the C5 dermatome, and 5/5 muscle strength bilaterally.  *Id.*  During that visit plaintiff expressed frustration over the lingering effects of his injury, stating he was "sick of it," he was "on the verge of snapping and killing somebody," he had "no patience," was "miserable," and "vicious things [were] going through [his] mind."  AT 190.  Effexor was recommended to address plaintiff's frustration with chronic pain.  AT 191.

On November 24, 1998, another physician with the Office of Pain Management recorded an impression that plaintiff's physical examination was unchanged, although Aull reported using home traction and the TENS unit with a marked reduction in pain.  AT 189.  It was noted that "overall [plaintiff] has responded marginally."  *Id.*  Plaintiff returned to the Office of Pain Management, on March 9, 1999,  complaining of cervical paraspinous tenderness bilaterally and tenderness throughout the left trapezius muscle. AT 188.  On that occasion Aull reported a reduction in pain and decrease in numbness in the second and third fingers of the right hand, due to the

administration of cervical facet blocks at C3-4 and C5.  *Id.*  Based upon those findings, the office requested from the worker's compensation carrier to continue cervical facet blocks.  *Id.*

Dr. Eng provided a letter on March 24, 1999 which stated "[Plaintiff's] disability is estimated as moderate at this time."  AT 202.  No further explanation was given in that correspondence regarding plaintiff's condition. *See id.*

Plaintiff's next reported medical visit took place on April 16, 1999, when he was seen by Dr. Tiso at the Office of Pain Management, who noted that plaintiff continued "only with Advil, approximately three tablets a day[,]" reporting pain reduction of approximately fifteen percent with a left cervical C2, C3, C4 block.  AT 187.  A physical examination performed on that date showed tenderness over the T3-4 at midline.  *Id.*

MRI testing performed on June 9, 1999 showed cerebellar ectopia with approximately eight millimeters of inferior displacement of the cerebellar tonsils consistent with Chiari I malformation.  AT 200.  Based upon those findings it was determined that plaintiff's condition was stable when compared to the previous MRI, with the presence of mild spondylosis, but no evidence of a syrinx.  *Id.*

Plaintiff underwent bilateral cervical paraspinous trigger point injections on August 4, 1999 and August 19, 1999, reporting that those injections offered temporary alleviation of pain.  AT 185.  Aull was subsequently seen by Dr. Tiso at the Office of Pain Management, on September 23, 1999.  *Id.* In reports of that visit the plaintiff was noted to be "obviously upset, angry, and frustrated with his persistent pain[,]" and it was suggested that he see a behavioral psychologist.  *Id.* Plaintiff was also encouraged during that visit to seek retraining through Vocational and Educational Services for Individuals with Disabilities (VESID).  *Id.*

In an October 7, 1999 treatment note, Dr. Eng stated that plaintiff "appear[ed] very depressed."  AT 198.  It was also noted upon that physical examination, plaintiff had a decreased pinprick in the C6, region, more on the left than on the right, and at C7 bilaterally.  *Id.*  Dr. Eng recommended that plaintiff seek vocational retraining, and reported that the etiology of plaintiff's symptoms was unknown.  *Id.*

On October 29, 1999, Zoloft was prescribed for the plaintiff to treat his depression.  AT 181.  Zoloft was offered at the time as a replacement for Paxil, which had been causing side effects. Id.

During a subsequent visit to the Office of Pain Management plaintiff

reported pain rated by him at 10/10, as opposed to 3/10 which he had

reported during the October appointment.  AT 179.  Plaintiff also reported

discontinuing Paxil and feeling "so much more like himself" after doing so that

he discarded both the Paxil and Zoloft, going off psychological medications

completely, adding that he "would rather 'not live' than have to take

medication for the rest of his life."  *Id.*  When asked whether he was suicidal,

plaintiff stated that he was not, provided that he had a treatment option other

than medication, and noting that he had no intention of contacting Dr.

Barbara Green, a psychologist who in August of 1998 had advised Aull that

he was a strong candidate for psychological intervention.  *Id; see also* AT

159-60.

Plaintiff saw Dr. Eng on December 30, 1999, reporting unchanged neck

and shoulder pain.  AT 197.  In a report of that visit, dictated by Physician's

Assistant Gregory Faltyn – who was also present – it was noted that plaintiff

appeared depressed, and agreed to radiofrequency treatment, although he

had discontinued use of all his pain medications.  *Id.*  Upon physical

examination, it was determined that plaintiff had full strength at the biceps

and triceps, and decreased pinprick sensation in the C6 dermatome on the

left and C7 bilaterally.  *Id.*  Dr. Eng stated that the etiology of plaintiff's

chronic pain was unknown, and recommended continued pain management treatment and VESID retraining.  *Id.*

On April 3, 2000 plaintiff sought a second neurosurgical opinion from Dr. Kenneth Yonemura.  AT 271-73.  Dr. Yonemura diagnosed the plaintiff as suffering from bilateral neurogenic thoracic outlet syndrome and asymptomatic C4-5 spondylosis, noting that he did not believe the foraminal narrowing at C4-5 was significant, and recommended physical therapy for treatment of the thoracic outlet syndrome.  AT 272-73.

After undergoing six weeks of physical therapy, as prescribed, plaintiff returned to Dr. Yonemura on July 20, 2000.  AT 270.  On that occasion plaintiff reported receiving relief for four to five hours at a time as a result of physical therapy, but experiencing continued numbness and tingling involving the third and fourth digits bilaterally, which was aggravated with arm elevation maneuvers and gentle palpation over the supraclavicular triangle.  *Id.*  Dr. Yonemura recommended brachial plexus decompression surgery.  *Id.*

Plaintiff underwent right side brachial plexus decompression surgery on October 5, 2000, followed by a similar procedure on the left side on May 14, 2001.  AT 262, 268.  Both surgeries were performed without complication.  *Id.* Dr. Yonemura noted on August 14, 2001 that plaintiff was doing "reasonably

well" following the operations, although he experienced some residual symptoms.  AT 258.  On October 9, 2001, Dr. Yonemura noted that plaintiff showed definite improvement in the upper extremities, but that he had some residual discomfort between the shoulder blades.  AT 257.  Dr. Yonemura opined that plaintiff could not perform his past work, but recommended vocational rehabilitation.  *Id.*  Following a later visit on April 3, 2002, Dr. Yonemura reported that plaintiff's symptoms and numbness had almost completely resolved, and that he instead complained of interscapular pain which he rated at 8/10 on a visual analog scale, AT 256, impeding his ability to perform normal activities.  *Id.*  Dr. Yonemura referred plaintiff for a musculoskeletal evaluation and consideration of prolotherapy.  *Id.*

Dr. Yonemura saw plaintiff again on September 8, 2003, at which time he complained of severe pain in the thoracic region.  AT 255.  Dr. Yonemura prescribed Lortab for pain, and ordered additional MRI testing.  *Id.*  The prescribed testing performed on October 6, 2003 revealed straightening of the lordotic curve in the upper cervical spine, minimal spondylosis at C5-6, disc osteophyte complexes at C3-4 and C4-5, a broad-based spondylolytic ridge at C4-5 causing bilateral mild foraminal stenosis, and degenerative disc disease at T7-8, T8-9, and T9-10.  AT 251.  On November 3, 2003, Dr.

Yonemura reported his opinion that this MRI test result did not reveal new pathology.  AT 321.

    C.   <u>Consultative Examiners</u>

Plaintiff underwent an IME conducted by Dr. Joseph Conrad, an orthopedic surgeon, on March 18, 1996.[3]  AT 166-69.  Plaintiff complained to Dr. Conrad of neck pain, concentrated in the cervical region.  AT 167.  Based upon his examination, Dr. Conrad opined that plaintiff suffered from temporary partial impairment of functioning of a mild degree, involving the use of the scapular muscles bilaterally.  AT 166.

Dr. Conrad examined plaintiff again on May 12, 1997, and recorded an impression of cervicalgia.  AT 161-65.  In his report of that examination Dr. Conrad opined that plaintiff should be placed on an aggressive exercise program for the cervical spine area as well as have instruction in posture control, with active aggressive exercise to strengthen the scapular rotators bilaterally.  AT 161.  Dr. Conrad also noted his view that plaintiff suffered from temporary partial impairment of function involving the use of the cervical

---

[3]    In his decision, the ALJ mistakenly refers to Dr. Joseph J. Conrad as an orthopedic surgeon from whom plaintiff sought treatment.  *See* AT 17.  It appears clear from the record, however,  that Dr. Conrad was retained solely to conduct an independent medical examination ("IME") of the plaintiff in March of 1996, and again in May, 1997.  AT 161-69.

spine to a mild degree, and that he was able to work at the time as long as he avoided placing the cervical spine at terminal arcs of motion on a constant or repetitive basis.   AT 162.

Dr. Reinhard Bothe performed a consultative orthopedic examination on October 14, 1998, noting a resulting impression of a history of neck pain and paresthesias in both hands, degenerative changes at the C4-5 level, and a Chiari I malformation.  AT 170-75.  Dr. Bothe made no objective findings of neurological deficit in the upper extremity, and found no particular muscle spasm in the neck and upper back, stating, "[a]ll of [plaintiff's] complaints are of subjective nature."  *Id.*  Dr. Bothe opined that plaintiff was capable of light work, which would entail lifting twenty pounds "now and then" throughout an eight-hour workday, and lifting and carrying ten pounds frequently; and working with his hands, though not above eye level; but should refrain from doing work which required frequent turning and bending of the neck.  AT 171.

Dr. Roy Hepner, another orthopedic surgery consultant, examined the plaintiff on July 12, 1999, reporting his impression of plaintiff's condition as chronic pain syndrome.  AT 176-78.  Dr. Hepner's physical examination showed tenderness in the midline upper cervical spine as well as the midline lower thoracic region and in the left and right inferior scapula borders.  AT

177.  Dr. Hepner noted an opinion of permanent mild disability for worker's compensation purposes.  AT 176.

Plaintiff was also consultatively examined by Dr. Daniel Elstein, an orthopedic surgeon, on November 16, 2001.  AT 243-45.  In a report of that examination Dr. Elstein noted that plaintiff had been diagnosed as having a major depressive disorder, and that plaintiff's right side had been operated on successfully but that the surgery on the left had produced some anterior left deltoid weakness, atrophy and some loss of sensation.  *Id.*  Despite these observations, Dr. Elstein found the plaintiff to have good strength as the posterior two-thirds of his deltoid were "working fine."  *Id.*  Based upon his evaluation, Dr. Elstein opined that plaintiff could return to light work, lifting up to twenty-five pounds with the capability of gross and fine manipulation using the upper extremities, additionally recommending VESID retraining and noting that he would need counseling to adjust to returning to work "because of his depression."  AT 245.

Plaintiff was examined by Dr. Myra Shayevitz on August 25, 2003.  AT 246-49.  In a report of that physical examination, Dr. Shayevitz noted that plaintiff experienced discomfort in the range of motion in the spine; discomfort with elevation of the arms and shoulders; and full range of motion

of the elbows, forearms, and wrists; decreased pinprick sensation on the left

side of the neck; and full range of motion and strength of the lower

extremities.  AT 248.  Dr. Shayevitz opined that plaintiff was "limited in any

prolonged sitting, standing, walking, or stair climbing[,]" adding that he was

limited in anything requiring rapid neck movements and any lifting except very

light items, lifted infrequently.  AT 249.

     D.    <u>RFC Assessment</u>

An assessment of plaintiff's RFC was completed by an agency

physician on December 10, 2003.  AT 285-90.  In that assessment, it was

found that plaintiff is able to lift twenty pounds occasionally and ten pounds

frequently; to sit, stand and/or walk for about six hours in an eight-hour

workday; and to push and/or pull to the extent of his lifting and carrying

restrictions.  AT 286.  Plaintiff was also found to have no postural,

manipulative, visual, communicative, or environmental limitations.  AT 287-

88.

    II.    <u>PROCEDURAL HISTORY</u>

     A.    <u>Proceedings Before The Agency</u>

Plaintiff protectively filed an application for DIB and SSI benefits on May

15, 2003, alleging disability as of February 15, 1996 due to neck pain,

degenerative disc disease, and depression.  AT 97, 183, 200.  Following the

denial of those requests, a hearing was conducted, at plaintiff's request,

before ALJ Charles Boyer on March 4, 2004.  AT 11-12, 30-70.

On January 19, 2005, following the close of that hearing, ALJ Boyer

issued a written decision regarding plaintiff's claim for benefits.  *See* AT 16-

29. In his decision ALJ Boyer applied the now-familiar five step test for

determining disability based upon his *de novo* review of the available medical

records, evidence, and hearing testimony.  After concluding at step one that

plaintiff had not engaged in substantial gainful activity since his alleged onset

date, AT 17, ALJ Boyer summarized the medical evidence amassed in the

record regarding the history of treatment for plaintiff's condition, as well as

the various independent medical IMEs and other consultative evaluations

performed.  AT 17-23.  Based upon those reports, ALJ Boyer concluded step

two of the analysis stating that plaintiff suffers from one or more physical

impairments of sufficient severity to limit his ability to perform basic work

activities, sufficient to satisfy the claimant's burden at that step of the

sequential analysis, but found that the conditions did not meet or equal any of

the listed, presumptively disabling impairments set forth in the controlling

regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 1.  AT 23-24.  ALJ Boyer went

on to consider whether plaintiff's diagnosed depression also qualified as sufficiently severe to meet step two of the test, ultimately determining that it did not, basing that finding in large part upon plaintiff's failure to obtain treatment for that condition.  AT 24-25.

The ALJ next turned to the task of determining plaintiff's RFC.  After rejecting plaintiff's complaints of disabling pain as not entirely credible, *see* AT 24, 26, ALJ Boyer concluded that plaintiff retains the RFC "to perform a wide range of light exertional activity."  AT 26.

Proceeding to step four of the disability algorithm, and applying his RFC finding, ALJ Boyer concluded that plaintiff cannot perform the requirements of his past relevant work, given the exertional requirements and repetitive bending, lifting, and twisting of the neck required in his prior positions.  AT 26-27.  At step five, after noting the shifting of burdens, ALJ Boyer initially applied the medical vocational guidelines set forth in the regulations, 20 C.F.R. Pt. 404, Subpt. P. App. 2 (the "grid") as a framework, determining that when applying his RFC finding as well as other relevant criteria to the grid, the result was a directed finding of no disability.  AT 27. ALJ Boyer next elicited testimony from an available vocational expert who, based upon a hypothetical question designed to approximate plaintiff's

circumstances, opined that despite his limitations plaintiff could work as a dispatcher, information clerk, or cashier, and that there were sufficient numbers of positions within those categories available in both the national and regional economies.  AT 27.  In light of the finding directed by the grid, buttressed by the vocational expert's testimony, ALJ Boyer concluded that a finding of no disability was required.  AT 27-28.  ALJ Boyer's opinion became a final determination of the agency on August 25, 2005, when the Social Security Administration Appeals Council denied plaintiff's request for review of that decision.  AT 5-7.

B.    This Action

Plaintiff commenced this action on September 21, 2005.  Dkt. No. 1. Issue was subsequently joined by the Commissioner's filing of an answer, together with an administrative transcript of the proceedings and evidence before the agency, on January 10, 2006.  Dkt. Nos. 3, 4.  With the filing of plaintiff's brief on March 27, 2006, Dkt. No. 7, and that on behalf of the Commissioner on May 19, 2006, Dkt. No. 10, this matter is now ripe for determination, and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District

of New York Local Rule 72.3(d).[4]  *See also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

     A.   Scope of Review

This action arises under 42 U.S.C. § 405(g).  A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner under that section is limited; that review requires a determination of whether the correct legal standards were applied, and whether the decision is supported by substantial evidence.  *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, his decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence. *Martone*, 70 F. Supp. 2d at 148.  If, however, the correct legal standards

---

[4]     This matter has been treated in accordance with the procedures set forth in General Order No. 18 (formerly, General Order No. 43) which was issued by the Hon. Ralph W. Smith, Jr., then-Chief United States Magistrate Judge, on January 28, 1998, and later amended and reissued by then-Chief District Judge Frederick J. Scullin, Jr., on September 19, 2001. Under that General Order an action such as this is considered procedurally, once issue has been joined, as if cross-motions for judgment on the pleadings had been filed pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

have been applied and the ALJ's findings are supported by substantial evidence, those findings are conclusive, and the decision should withstand judicial scrutiny regardless of whether the reviewing court might have reached a contrary result if acting as the trier of fact.  *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *Barnett v. Apfel*, 13 F. Supp. 2d 312, 314 (N.D.N.Y. 1998) (Hurd, M.J.); *see also* 42 U.S.C. § 405(g).

The term "substantial evidence" has been defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)); *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003). To be substantial, there must be "'more than a mere scintilla'" of evidence scattered throughout the administrative record.  *Richardson*, 402 U.S. at 401, 91 S. Ct. at 1427; *Martone*, 70 F. Supp. 2d at 148 (citing *Richardson*).  "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams*,

859 F.2d at 258 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 715 S. Ct. 456, 464 (1951)).

When a reviewing court concludes that incorrect legal standards have been applied, and/or that substantial evidence does not support the agency's determination, the agency's decision should be reversed.  42 U.S.C. § 405(g); *see Martone*, 70 F. Supp. 2d at 148.  In such a case the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to develop a full and fair record or to explain his or her reasoning.  *Martone*, 70 F. Supp. 2d at 148 (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).  A remand pursuant to sentence six of section 405(g) is warranted if new, non-cumulative evidence proffered to the district court should be considered at the agency level.  *See Lisa v. Sec'y of Dep't of Health and Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991).  Reversal without remand, while unusual, is appropriate when there is "persuasive proof of disability" in the record and it would serve no useful purpose to remand the matter for further proceedings before the agency.  *Parker*, 626 F.2d at 235; *Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 57 (2d Cir. 1992); *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983).

-24-

B.      Disability Determination - The Five Step Evaluation Process

The Social Security Act defines "disability" to include the "inability to

engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result

in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).   In addition,

the Act requires that a claimant's

> physical or mental impairment or impairments [must be] of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which exists
> in the national economy, regardless of whether such work exists
> in the immediate area in which he lives, or whether a specific job
> vacancy exists for him, or whether he would be hired if he applied
> for work.

*Id.* § 423(d)(2)(A).

The agency has prescribed a five step evaluative process to be

employed in determining whether an individual is disabled.  *See* 20 C.F.R. §§

404.1520, 416.920.  The first step requires a determination of whether the

claimant is engaging in substantial gainful activity; if so, then the claimant is

not disabled, and the inquiry need proceed no further.  *Id.* §§ 404.1520(b),

416.920(b).  If the claimant is not gainfully employed, then the second step

involves an examination of whether the claimant has a severe impairment or

combination of impairments which significantly restricts his or her physical or mental ability to perform basic work activities. *Id.* §§ 404.1520(c), 416.920(c). If the claimant is found to suffer from such an impairment, the agency must next determine whether it meets or equals an impairment listed in Appendix 1 of the regulations. *Id.* §§ 404.1520(d), 416.920(d); *see also id.* Part 404, Subpt. P, App. 1. If so, then the claimant is "presumptively disabled". *Martone*, 70 F. Supp. 2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)); 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an assessment of whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). If it is determined that it does, then as a final matter the agency must examine whether the claimant can do any other work. *Id.* §§ 404.1520(f), 416.920(f).

The burden of showing that the claimant cannot perform past work lies with the claimant. *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Ferraris*, 728 F.2d at 584. Once that burden has been met, however, it becomes incumbent upon the agency to prove that the claimant is capable of performing other work. *Perez*, 77 F.3d at 46. In deciding whether that burden has been met, the ALJ should consider the claimant's RFC, age,

education, past work experience, and transferability of skills.  *Ferraris*, 728

F.2d at 585; *Martone*, 70 F. Supp. 2d at 150.

      C.     <u>The Evidence in this Case</u>

      In support of his challenge to the agency's determination, plaintiff raises

several arguments.  Plaintiff initially takes issue with the ALJ's failure to fully

develop the record with regard to his mental impairment, suggesting that he

was dutibound to either make arrangements for a consultative psychological

evaluation or to contact Dr. Barbara Green, who in 1998 examined the

plaintiff, for a further opinion.  Plaintiff also finds fault with the ALJ's RFC

finding, asserting that by failing to provide a function-by-function analysis the

ALJ did not fulfill his obligation under the regulations.  Lastly, plaintiff attacks

the ALJ's reliance upon the testimony of a vocational expert on several

bases, arguing that the vocational expert was not properly qualified, that the

hypothetical question posed was vague and did not accurately correspond to

plaintiff's circumstances and limitations, and that the vocational expert did not

correlate his testimony to Dictionary of Occupational Titles ("DOT") sections.

      1.     <u>Psychological Impairments/Failure to Develop the Record</u>

      The record assembled in this action contains a great deal of information

regarding the treatment over time of plaintiff's physical impairments.  In

support of his challenge to the Commissioner's determination, however,

plaintiff asserts that conspicuously lacking is evidence which would provide

an assessment of his diagnosed depression and its impact upon his ability to

perform work related functions.

By statute, an ALJ is duty bound not only to develop a claimant's

complete medical history for at least twelve months prior to the filing of an

application for benefits, "but also to gather such information for a longer

period if there [is] reason to believe that the information [is] necessary to

reach a decision." *DeChirico v. Callahan*, 134 F.3d 1177, 1184 (2d Cir. 1998)

(citing 42 U.S.C. § 423(d)(5)(B) as incorporated by 42 U.S.C. §

1382c(a)(3)(G) and 20 C.F.R. § 416.912(d)).  The applicable regulations

supplement this statutory requirement, directing that an ALJ subpoena a prior

disability file pertaining to the claimant if deemed "'reasonably necessary for

the full presentation of [the] case.'" *DeChirico*, 134 F.3d at 1184 (quoting 20

C.F.R. § 416.1450(d)(1)).  While these obligations are particularly critical in

the case of a claimant who is unrepresented by counsel, *see Mimms v.*

*Heckler*, 750 F.2d 180, 185 (2d Cir. 1984), they also have application in a

case such as this, where the information sought was specifically requested

by plaintiff's counsel. *Contrast DeChirico*, 134 F.3d at 1184 (finding that ALJ

did not abuse his discretion in failing to subpoena prior file since fact of

plaintiff's impairment was not in dispute and counsel offered no basis to

conclude that the former file would be relevant).

The Commissioner argues that the ALJ was under no duty to obtain

additional information regarding plaintiff's mental condition, contending that in

his application for benefits plaintiff attributed his inability to work solely to his

physical condition.  This assertion is not supported, and indeed is directly

contrary to facts disclosed in the record.  While it is true that in a disability

report completed by him in connection with his application for Social Security

benefits Aull states that he stopped working as a result of his physical

condition, *see* AT 106, in another disability report form in which he was asked

"[w]hat are the illnesses, injuries or conditions that limit your ability to work?",

plaintiff responded "[n]eck injury, depression."  AT 115.

In any event, even if plaintiff had failed to reference his mental

impairment in connection with his application for benefits, the inquiry would

not end.  The governing regulations require that the agency "consider only

impairment(s) which [plaintiff says he has] *or* about which [the Administration

has] evidence." 20 C.F.R. §§ 404.1512(a), 416.912(a) (emphasis added).

"The disjunctive phrasing of this rule requires an ALJ to investigate the

disabling effects of an impairment if the record contains evidence indicating

that such an impairment might exist. This obligation is triggered without

regard to whether the claimant has alleged that particular impairment as a

basis for disability." *Prentice v. Apfel*, 11 F. Supp. 2d 420, 427 (S.D.N.Y.

1998).

In this instance there is ample evidence in the record suggesting that

plaintiff has suffered from depression.  In October of 1998, for example,

plaintiff stated that he was "on the verge of snapping and killing somebody,"

he had "no patience," "was miserable," and "vicious things [were] going

through [his] mind."  AT 190.  As a result, Dr. Tiso prescribed Effexor for

plaintiff's depressive symptoms.  AT 191.  In September of 1999, Dr. Tiso

noted that plaintiff was "obviously upset, angry, and frustrated with his

persistent pain[,]" and he recommended that plaintiff see a behavioral

psychologist, prescribing Paxil for plaintiff's depressive symptoms.  AT 185.

Dr. Eng stated in October of 1999, that plaintiff "appear[ed] very depressed",

and prescribed Zoloft as a replacement for Paxil.  AT 181, 198.  On

December 14, 1999, plaintiff reported voluntarily stopping taking

psychological medications, but he stated that he "would rather 'not live' than

have to take medication for the rest of his life."  AT 179.  Dr. Eng again noted

on December 30, 1999, that plaintiff appeared depressed.  AT 197.  A

consultative evaluation by Dr. Elstein noted a diagnosis of depressive

disorder.  AT 245.  Dr. Elstein also opined that plaintiff would need

counseling to adjust to returning to work "because of his depression."  *Id.*

In his decision, ALJ Boyer only briefly discussed plaintiff's mental

impairment, stating:

> The claimant has never participated in mental health
> therapy, psychiatric or inpatient treatment.  His
> antidepressant medication is prescribed by his treating
> physician, not by a mental health care professional, and
> there is no evidence that the claimant has depressive
> disorder, other than references made to prescriptions for
> antidepressants.  Moreover, these medications have
> been prescribed to assist with sleep disturbance and pain
> relief.  At no time has the claimant alleged disability due
> to a mood or emotional problems and no treating or
> examining physician has ever indicated that the claimant
> has a mood or emotional condition that is disabling.  The
> [ALJ] acknowledges that the claimant may have episodic
> periods when he experiences some depressive
> symptoms, but it is obvious from the evidence of record
> that he does not have a serious condition as he has not
> sought treatment and when he was referred for therapy
> by Workers' Compensation he never followed up after the
> initial visit with the Pain Management therapist.  He has
> no symptoms that even remotely meet or equal the 'A' or
> 'B' criteria of any impairment listed in Section 12.00 [of 20
> C.F.R. Part 404, Subpart B, Appendix 1].  Thus, the
> claimant does not have a severe depressive condition as
> substantiated by the lack of medical evidence and
> absence of medical source opinion.

AT 24-25.  This analysis, unfortunately, does not accurately reflect the evidence of depression in the record.  For example, the ALJ states that plaintiff's antidepressant medications were prescribed for "sleep disturbance and pain relief," when this was clearly not the case.  *See* AT 179, 181, 185, 190-91.  Moreover, the record does not support the ALJ's conclusion that plaintiff "obvious[ly] . . . does not have a serious condition."

In sum, regardless of whether the plaintiff raised depression as an impairment on his initial applications – which clearly he did – the ALJ was required to investigate the effects of his depression because evidence of it appeared in the medical record.  20 C.F.R. §§ 404.1512(a), 416.912(a); *see Prentice*, 11 F. Supp. 2d at 427; *Batista v. Chater*, 972 F. Supp. 211, 218 (S.D.N.Y. 1997).  Under the circumstances, I conclude that the ALJ should have granted plaintiff's request for a psychological evaluation, the results of which would have helped to clarify the extent of plaintiff's depression and allowed for a determination of whether it had a significant effect on his ability to perform work-related activities.  The failure to take this step represents a breach of the ALJ's duty to fully develop the record.

Before leaving the question of plaintiff's mental impairment, I feel compelled to note that the ALJ also failed to follow the proper analysis in

evaluating that condition.  When there is evidence of a mental impairment

that allegedly prevents a claimant from working, the Commissioner must

follow a special procedure at each level of administrative review.  *See* 20

C.F.R. §§ 404.1520a, 416.920a.  The Commissioner first records the

pertinent signs, symptoms, findings, functional limitations, and effects of

treatments contained in the record.  *Id.* §§ 404.1520a(b)(1), 416.920a(b)(1).

If a mental impairment is determined to exist, the Commissioner must next

indicate whether certain medical findings which have been found especially

relevant to the ability to work are present or absent.  *Id.* §§ 404.1520a(b)(2),

416.920a(b)(2).  In doing so the Commissioner rates the degree of functional

loss resulting from the impairment – on a scale ranging from no limitation to

severe limitation, the latter of which is incompatible with the ability to do

work-like functions – analyzing four specific factors, including 1) activities of

daily living; 2) social functioning; 3) concentration, persistence, and pace;

and 4) deterioration or decompensation in work or work-like settings.  *Id.* §§

404.1520a(c)(3), 416.920a(c)(3).

The Commissioner must then determine the severity of the mental

impairment.  *Id.* §§ 404.1520a(d), 416.920a(d)(2).  Where the Commissioner

rates the degree of limitation in the first three functional areas as "none" or

"mild", and "none" in the fourth functional area, the Commissioner will generally conclude that claimant's impairment is not severe, unless the evidence indicates otherwise.  *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1).  If, on the other hand, the Commissioner finds the claimant's medical impairment to be severe, he must determine whether it meets or equals a listed mental disorder.  *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2).  In the event the impairment is deemed severe, but does not meet or equal a listed mental disorder, the Commissioner next analyzes the claimant's RFC, considering whether he or she is limited in the ability to carry out certain mental activities – such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting – to such a degree as to reduce his or her ability to do past relevant work and other work.  *See* 20 C.F.R. §§ 404.1520a(d)(3), 404.1545(c), 416.920a(d)(3), 416.945(c).

An ALJ is no longer required under the governing regulations to append a Psychiatric Review Technique Form ("PRTF") to his or her decision when addressing a case when a psychological impairment is implicated.  65 Fed. Reg. 50746-01 (Aug. 21, 2000), *available at* 2000 WL 1173632, at *50758. The ALJ is, however, nonetheless subject to the requirement that an analysis

of whether a mental impairment exists be incorporated or in some way embodied within his or her decision when evidence of such an impairment is presented.  20 C.F.R. §§ 404.1520a.

To trigger these requirements a claimant bears the initial responsibility of providing medical evidence sufficient to indicate the potential existence of a mental impairment.  *Howell v. Sullivan*, 950 F.2d 343, 348 (7th Cir. 1991) (citing 20 C.F.R. §§ 404.1508, 404.1514).  This he has done.  ALJ Boyer thus should proceed to engage in the analysis contemplated under 20 C.F.R. §§ 404.1520a and 416.920a.  On remand, the ALJ should analyze plaintiff's mental impairment in accordance with the procedure set forth in those regulations.

### 2.  RFC

In further support of his challenge, plaintiff claims that the ALJ failed to provide an accurate, function-by-function assessment of his RFC.

A claimant's RFC represents a finding of the range of tasks he or she is capable of performing notwithstanding the impairments at issue.  20 C.F.R. § 404.1545(a).  An RFC determination is informed by consideration of a claimant's physical abilities, mental abilities, symptomology, including pain, and other limitations which could interfere with work activities on a regular

and continuing basis.  *Id.*; *Martone*, 70 F. Supp. 2d at 150.

To properly ascertain a claimant's RFC, an ALJ must therefore assess plaintiff's exertional capabilities, addressing his or her ability to sit, stand, walk, lift, carry, push and pull.  *Id.*; 20 C.F.R. §§ 404.1545(b), 404.1569a. Nonexertional limitations or impairments, including impairments which result in postural and manipulative limitations, must also be considered.  20 C.F.R. §§ 404.1545(b), 404.1569a; *see also* 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e).  When making an RFC determination, an ALJ must specify those functions which the claimant is capable of performing; conclusory statements concerning his or her capabilities, however, will not suffice.  *Martone*, 70 F. Supp. 2d at 150 (citing *Ferraris,* 728 F.2d at 587).  An administrative RFC finding can withstand judicial scrutiny only if there is substantial evidence in the record to support each requirement listed in the regulations.  *Martone*, 70 F. Supp. 2d at 150 (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Sobolewski v. Apfel*, 985 F. Supp. 300, 309-10 (E.D.N.Y. 1997).

"The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and

(d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy."  SSR 96-8p, *Assessing Residual Functional Capacity in Initial Claims*, 1996 WL 374184, at *1 (S.S.A. 1996).

In this case, the ALJ made the following RFC determination:

> [W]eighing the objective evidence, the opinions of treating and examining physicians, and the claimant's less than credible testimony, I concur with the determination of the state agency physicians and find that the claimant retains the [RFC] to perform a wide range of light exertional activity.  In reaching my conclusion with regard to the claimant's [RFC] I have given consideration to his allegations of pain.

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, an individual must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods.

AT 26.

ALJ Boyer's finding with regard to plaintiff's RFC can be distilled into a single sentence: the claimant is capable of performing "a wide range of light

exertional activity."  While the ALJ's ensuing discussion concerning the

contours of the light work category could be viewed as implicitly setting forth

his finding that plaintiff is capable of performing all of those functions, this is

far from clear.  Indeed, rather than making a function-by-function assessment

of the plaintiff's residual capabilities, the ALJ instead merely reported his

RFC finding in conclusory fashion devoid of specifics regarding the precise

limitations discerned.  This falls far short of complying with the requirement of

a function-by-function assessment of plaintiff's capabilities, as required under

SSR 96-8p as well as the applicable regulations.  *See* 20 C.F.R. §§

404.1545, 416.945.  This, then, provides yet another basis for reversal of the

Commissioner's determination and the remand of the matter to the agency

for a proper evaluation of plaintiff's RFC.

### 3.   Vocational Expert Testimony

Plaintiff argues that the testimony elicited by the ALJ from the

vocational expert was improper.  Plaintiff contends that the hypothetical

question posed by the ALJ to the expert was vague and inaccurately

portrayed of his limitations.

It is well established that elicitation of testimony from a vocational

expert is a proper means of fulfilling the agency's burden at step five of the

disability test to establish the existence of jobs in sufficient numbers in the national and regional economy that plaintiff is capable of performing. *Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d Cir. 1986); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983); *Dwyer v. Apfel*, 23 F. Supp. 2d 223, 229-30 (N.D.N.Y. 1998) (Hurd, M.J.) (citing *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)); *see also* 20 C.F.R. §§ 404.1566, 416.966.  In order to meet his burden at step five, the Commissioner must make a finding, supported by substantial evidence, that Plaintiff retains the vocational qualifications to perform specific jobs. *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question, but only if the question accurately portrays [plaintiff's] individual physical and mental impairments." *Id.* (citations and quotations omitted).

In this case, the ALJ asked the expert to assume a forty-three year old individual with a high school education, and posed the following hypothetical:

> ALJ:  . . . [A]ssume that he has limitation in any prolonged sitting, standing, walking or climbing.  Extremely limited [in] anything requiring rapid neck movements and any lifting except for something very light, and even then only lifting infrequently.  If I ask you just to assume those limits, that would be limited lifting. .

. We would have a light nature, of a light nature?

VE:   Yes.

ALJ:  And the prolonged sitting, standing, walking or
      climbing I would interpret to say alternate, the ability
      to alternate between sitting and standing.
      Assuming those limitations, and again excluding
      rapid neck movements, would there be jobs that he
      would be considered capable of performing?

VE:   Well, let me clear up just one issue again. . . . To
      make sure that I understand that. . . . Would he be
      able to sit, stand, walk in combination throughout an
      eight-hour day?

ALJ:  For purposes of this hypothetical, yes, that it would
      have to be at or near the work station five days a
      week, eight hours a day.  Full-time work.

AT 64-65.  Following this exchange, the expert responded that plaintiff could

perform work as a dispatcher, receptionist or information clerk, and cashier.

AT 65.

      The sufficiency of testimony of a vocational expert, used to satisfy the

Commissioner's burden at step five of the disability calculus, hinges entirely

upon a proper RFC finding, and the posing of questions to the vocational

expert detailing all limitations discerned.  In this instance, having carefully

reviewed the matter, I agreed with the plaintiff that the hypothetical posed to

the vocational expert was, at best, vague, and certainly did anything but

-40-

contain a complete and detailed description of plaintiff's functional capacities.

In his hypothetical, for example, the ALJ did not clearly describe the

parameters of limitations on plaintiff's ability to sit, stand and walk, instead

merely stating that he should be expected to be "at or near the work station

five days a week, eight hours a day."  AT 64-65.  Moreover, while the ALJ did

indicate that the plaintiff would be required to have "the ability to alternate

between sitting and standing," he failed to provide "specific[s] as to the

frequency of [plaintiff's] need to alternate sitting and standing.  SSR 96-9p,

*Determining Capability to Do Other Work: Implications of a Residual*

*Functional Capacity for Less Than a Full Range of Sedentary Work*, 1996 WL

374185, at *7 (S.S.A. 1996).

In light of my earlier finding regarding the inadequacy of the ALJ's RFC

determination, exacerbated by the vagueness and insufficiency of the

hypothetical questions posed to the vocational expert, I conclude that the

expert's opinions cannot properly form a basis for the finding of no disability

and warrant reversal of the Commissioner's determination.[5]

---

[5]      In light of this finding I have not independently addressed plaintiff's challenge to the vocational experts qualifications.  In addition, I have not addressed the claim that the vocational experts testimony is not consistent with DOT titles, although clearly such a requirement must be met.  *See* SSR 00-4p, *Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions*, 2000 WL 1898704, at *2 (S.S.A. 2000).

IV.   <u>SUMMARY AND RECOMMENDATION</u>

In light of the significant evidence in the record suggesting that the defendant has suffered, and been treated through medication for, depression, the failure of the ALJ to grant plaintiff's request for a psychological evaluation resulted in an incomplete record, requiring reversal of the Commissioner's determination.  Additionally, the ALJ's insufficient RFC finding, including his failure make a function-by-function analysis of plaintiff's residual capabilities, provides another basis for reversal of the determination. Since the vocational expert's testimony at the step five determination, as well as the Commissioner's resort to the grid as a framework, were both dependent upon an RFC determination which does not garner support from the record, this determination also is insufficient.  I therefore recommend that the Commissioner's determination of no disability be reversed and the matter be remanded to the agency for further proceedings.

Based on the foregoing, it is hereby

RECOMMENDED, that the plaintiff's motion for judgment on the pleadings be GRANTED, and that the Commissioner's decision finding no disability and denying disability benefits be REVERSED and that the matter be REMANDED for further proceedings consistent with this report.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within ten (10) days.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.   28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

IT IS FURTHER ORDERED, that the Clerk of the Court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

Dated:      May 27, 2008
            Syracuse, New York


_____
David E. Peebles
U.S. Magistrate Judge